# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANNA L. McCADD and HAROLD McCADD, JR. ) ) | |
| Plaintiffs, ) | |
| ) | No. 09 CV 1958 |
| v. ) | Judge Blanche M. Manning |
| ) | |
| WILLIAM T. MURPHY, DAN LACKO, JOHN ELSTNER, DANIEL J. O'TOOLE, and the CITY OF CHICAGO, ) ) ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Twice in early 2009, Chicago police stormed the home of the plaintiffs, Harold McCadd and his 91-year-old mother, Anna.[1] On both occasions, police were looking for drugs or equipment used to package and distribute drugs. Police left without finding what they were looking for but, after the second search, arrested Harold nevertheless. Prosecutors eventually dropped the charges against Harold due to lack of evidence.

The McCadds sued the City of Chicago as well as the officers who searched their home and searched and arrested Harold, alleging violations of their constitutional rights as well as malicious prosecution. The defendants have filed a motion for summary judgment on all of the McCadds' claims. For the reasons that following, the motion for summary judgment is denied.

## BACKGROUND

The following facts are undisputed except where noted. On January 24, 2009, Harold McCadd left his home at 9429 S. Loomis in Chicago to get a 7-Up for his mother from the corner store. After purchasing the soda, he ran into a friend who offered him a ride home. At the same

---

[1]The court will refer to the McCadds by their first names for clarity.

time, several Chicago police officers were patrolling the 9400 block of south Loomis, and saw Harold return home and get out of his friend's car. The parties do not agree on what happened next. According to the defendants, two police officers observed Harold making hand-to-hand transactions with several different persons, and observed money changing hands. Harold disputes the officers' account, and contends that he merely said hello to a friend on the sidewalk and then attempted to enter his own house.

Before Harold could reach his front door, defendant officer Dan Lacko approached him and said "Drop it" and "You're under arrest." Harold told Lacko that all he had was a can of pop, which he dropped to the ground. Lacko then tackled Harold, knocked him to the ground, handcuffed him, and arrested him.

Lacko searched Harold, but found no contraband. Lacko then reached into Harold's pocket and removed his keys. In the meantime, other officers stopped the car that had dropped off Harold, but found no contraband there, either.

Another officer at the scene took the keys that Lacko had removed from Harold's pocket and entered his home unannounced. Harold's mother, Anna, was standing at the top of the stairs leading to the home's second floor. The officer pulled Harold to the front door and asked Anna if he was her son. She confirmed that he was and that he had gone to the store to purchase a 7-Up for her. The officers then (1) brought Harold into the home; (2) asked him which bedroom was his; (3) told Anna that Harold was under arrest; (4) told Anna that if there were any drugs in the home she could lose the home; and (5) that if she did not identify where the drugs were, they would bring dogs into her home.

Harold then asked officers if they had a warrant, to which they responded that they did not need one. One of the officers then put a consent to search form in front of Anna and asked her to sign it, but did not verbally ask for permission to search, did not advise her that she could refuse to sign the consent form, and did not read the consent form to her. Anna signed it without reading it because she feared that Harold would be taken to jail and beaten by police if she refused.[2] She completed signing the form within 30 seconds to one minute after officers first entered her home. Officers then searched the home, found no contraband, and removed Harold's handcuffs.

However, defendant officer John Elstner then ordered Harold to submit to a strip search, which Elstner performed in Harold's bedroom. Elstner contends that he was looking for guns or drugs on Harold's person. The parties agree that Elstner conducted the search visually and did not touch Harold. After Elstner found nothing during the strip search, the officers left, but warned the McCadds that officers would continue watching them and would return.

On February 18, 2009, officers returned, battering through the McCadd's front door with a ramming device and storming into the home with guns drawn. Police were there to execute a search warrant obtained by defendant officer William Murphy after a John Doe informant told him about buying crack cocaine from a man named "Harold" at 9429 S. Loomis. According to the John Doe informant, "Harold" had stated that his drug operation was up and running, had shown the informant a large plastic bag full of crack, told the informant that he had huge

---

[2] In their response brief, the McCadds also assert that Anna was told that she could not call her daughter or even answer the phone if anyone called while police were there. However, the support cited is deposition testimony from Anna's daughter, who was not present during the search. Her knowledge of what occurred is based upon what her mother told her and, therefore, is inadmissible hearsay.

quantities of crack for sale, told the informant that crack was available to purchase at any time, and described Harold measuring the crack he sold to the informant using a scale.

Before seeking a warrant based on the John Doe informant's statements, Murphy checked Harold's criminal record, which Murphy contends revealed a prior arrest for cocaine possession, and showed the informant a picture of Harold McCadd and the McCadd home, which the informant positively identified. However, Murphy did not do the type of independent surveillance or controlled purchases he normally conducts prior to obtaining a search warrant. Murphy, defendant officer Daniel O'Toole, and the John Doe informant all signed a complaint for a warrant to search Harold and the McCadd home for cocaine or paraphernalia used to weigh, cut, or mix illegal drugs, which was issued by a state court judge.

Police searched Harold and his home for about an hour. After finding no drugs or paraphernalia on Harold or in his home, police brought in a drug-sniffing dog. The parties' account of what happened next diverges at this point. According to police, the drug-sniffing dog signaled that he had detected drugs in a back bedroom near a dresser. Officer O'Toole then searched the area near the dresser and found a plastic vial containing a white powdery substance he believed to be heroin rather than cocaine. The plaintiffs, however, contend that the drug-sniffing dog found nothing, and that officers recovered the plastic vial containing the white powdery substance from a suitcase in the attic, which Anna identified as talcum powder she used to freshen up when visiting relatives.

Officers were not sure what the white powdery substance was at the time, and they did not field test the substance, although they had kits with them that would have allowed them to test the substance and, in fact, officer Murphy admits that he should have tested the powder.

Officers also failed to find any of the objects the John Doe informant had described, such as large plastic bags containing crack cocaine or packaging paraphernalia such as a scale. Nevertheless, officers arrested Harold, and held him for more than a week until his family raised enough for bail. In the meantime, officer Murphy "cussed out" the John Doe informant for providing false information about the drugs and paraphernalia he told officers they would find in the McCadd home. Murphy has not used the informant again. The charges against Harold were eventually dropped *nolle prosequi* after laboratory tests revealed that the white powdery substance recovered from the McCadd home was not an illegal drug.

Based upon their experiences with the defendants, the McCadds filed suit alleging violations of their constitutional rights as well as claims under state law. Specifically, the claims in their Second Amended Complaint consist of the following: (a) a claim of unlawful search under 42 U.S.C. § 1983 against all of the defendants based upon both the January 24, 2009, and the February 18, 2009, searches of their home and of Harold (Count I); (b) a claim of unlawful arrest under 42 U.S.C. § 1983 against defendants Murphy, O'Toole and the City of Chicago based upon his February 18, 2009, arrest (Count II); (c) a claim of malicious prosecution under Illinois law against defendants Murphy, O'Toole and the City of Chicago (Count III); and (d) claims of *respondeat superior* (Count IV) and for indemnification (Count V) under Illinois law against the City of Chicago.

The defendants have moved for summary judgment on all of the McCadds' claims. In support, they argue that: (a) they are entitled to judgment on Count I because the January 24 search was with consent and the February 18 search was pursuant to a properly executed warrant; (b) they are entitled to judgment on Count II because either they had probable cause to

arrest Harold on February 18 and were therefore entitled to conduct a search incident to arrest, or because they are protected by qualified immunity; (c) they are entitled to judgment on Count III because the probable cause they had to arrest Harold bars the McCadds' malicious prosecution claim; and (d) because the individual defendants are not liable to the McCadds, the City of Chicago is not liable under either *respondeat superior* (Count IV) or indemnification (Count V).

## ANALYSIS

**I.    Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti*, 970 F.2d at 365; *see also Anderson*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine issue of material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248. The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

## II.  Illegal Search  (Count I)

In Count I, the McCadds identify three allegedly illegal searches:  (a) the January 24, 2009, search of their home; (b) the January 24, 2009, strip search of Harold; and (c) the February 18, 2009, search of the McCadds' home.  The defendants contend that the undisputed evidence demonstrates each of those searches was proper and, therefore, they are entitled to judgment.  The court addresses each search in turn.

### A.  January 24 Search of Home

The defendants contend that the January 24, 2009, search of the McCadd home was lawful because Anna consented, citing in support the written consent that Anna executed.  In response, the McCadds identify evidence that they contend demonstrates Anna's consent was invalid because it was the product of duress or coercion.

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  The relevant factors include "(1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent."  *United States v. Alexander*, 573 F.3d 465, 477 (7th Cir. 2009).  The burden of establishing voluntariness falls on the government.  *See Schneckloth*, 412 U.S. at 222.

The McCadds have identified evidence that would allow jurors to conclude that Anna's consent was not voluntary.  For instance, it is undisputed that prior to Anna signing the consent

form, officers brought Harold into the home and told Anna that he was under arrest, told Anna that if any drugs were in the home she could lose it, and told her that if she did not identify where the drugs were they would bring in dogs into her home. *See* Defendants' Responses to Plaintiffs' Statements of Undisputed Fact [61-1] ¶¶ 11 - 18. It is also undisputed that the 91-year-old Anna feared that if she did not sign the consent form, officers would take Harold to jail and beat him up. She testified at her deposition that her fear was based on the fact the police arrested Harold even though he

> had just gone to the store for a 7-Up. And I was afraid because a lot of the young men had been getting beat up by the police and stuff around in the neighborhood, and I was afraid that he had some problem and that he would get beaten up. That's why I went on and signed the paper and didn't ask any questions and just signed.

Anna Deposition (attached as Exhibit C to Plaintiffs' Responses to Defendants' Statements of Undisputed Facts [56-1]) at 35-36. The defendants contend that none of these facts matter because Anna's "reasons for blindly signing the consent to search does not change the voluntariness of her consent." But the defendants' argument flies in the face of the factors listed above, each of which requires the factfinder to evaluate both the characteristics of the person who allegedly consented, as well as the circumstances surrounding the giving of consent, in order to determine the voluntariness of the consent. The McCadds have identified evidence that would support a factfinder's determination that Anna's consent was the product of coercion or duress, including officers' statements that she might lose her home and her fear that officers would beat up her son if she did not give consent. Accordingly, the defendants are not entitled to judgment on the McCadds' claim that the January 24 search was unconstitutional.

**B.     January 24 Strip Search of Harold**

Next, the defendants seek judgment on the McCadd's claim that defendant Elsner's strip search of Harold on January 24 was unconstitutional. They contend that the search was valid because it was conducted incident to arrest. Police are entitled to conduct a search incident to arrest based upon the need to (1) disarm the suspect, and (2) preserve evidence for later use at trial. *See Knowles v. Iowa*, 525 U.S. 113, 116 (1998). If the arrest was reasonable under the Fourth Amendment, a search incident to that arrest is also considered reasonable under the Fourth Amendment as long as it is not "extreme or patently abusive." *United States v. Robinson*, 414 U.S. 218, 236 (1973). In addition, to justify a strip search, officers must have a reasonable suspicion that the suspect is concealing contraband or weapons. *See Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983). A "narcotics violation" is one of the "kinds of crimes . . . that might give rise to a reasonable belief that the . . . arrestee was concealing an item in a body cavity." *Id.*

The McCadds have not challenged that officers had probable cause to arrest Harold for a narcotics violation on January 24. While probable cause to arrest for a narcotics violation alone may not be enough to justify a strip search, officers here had more. Specifically, the officers had already patted down Harold's clothing and searched his home and, therefore, the only remaining place for them to search was Harold's person. Accordingly, given that the McCadds have not challenged officers' probable cause to arrest him for a drug offense, and given officers' use of a strip search as a last resort, the McCadds have identified no evidence that the search was not reasonable. As a result, the defendants are entitled to summary judgment on the portion of Count I that is premised on the January 24 strip search of Harold.

### B. February 18 Search of Home

Next, the defendants contend that they are entitled to judgment on the McCadds' claim that the February 18 search was unconstitutional. In support, the defendants assert that the search was lawful because it was conducted pursuant to a valid search warrant. However, the McCadds argue that the warrant was not valid and that, even if valid, it was not executed in a reasonable manner.

#### 1. Validity of the Warrant

A search warrant is valid under the Fourth Amendment if it is based upon probable cause and particularly describes the places to be searched and the person or things to be seized. *See Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009). Probable cause may be established by affidavit if the affidavit identifies sufficient evidence to convince a reasonable person that a search will uncover evidence of the alleged crime. *United States v. Carmel*, 548 F.3d 571, 575 (7th Cir. 2008). However, when an informant supplies the facts in the affidavit, the probable cause determination also turns on the informant's credibility. *See United States v. Bell*, 585 F.3d 1045, 1049-50 (7th Cir. 2008). Relevant factors include: "(1) the extent to which police corroborated the informant's statements; (2) the degree to which the informant acquired knowledge of the events through first-hand observation; (3) the amount of detail provided; (4) the interval between the date of the events and the police officer's application for the search warrant; and (5) whether the informant appeared before the issuing judge so that the judge could assess the informant's credibility." *Id.* at 1050.

The McCadds contend that the February 18 warrant was not supported by probable cause because officers failed to adequately corroborate the information they received from the

informant.  It is undisputed that officers showed the informant a picture of Harold McCadd and of the McCadds' home, and that the informant positively identified both.  The defendants contend that such an investigation is sufficiently corroborative, citing in support *United States v. White*, 416 F.3d 634 (7th Cir. 2005) and *United States v. Guzman*, No. 05 CV 6617, 2008 WL 4542963 (N.D. Ill. Apr. 8, 2008).  Those cases focused on whether an officer sufficiently corroborated an informant's description of the premises to be searched by viewing the premises himself.  *See White*, 416 F.3d at 638-40; *Guzman*, 2008 WL 4542963, at \*\*6-7.  They did not hold that an officer need not do more and, in fact, merely corroborating innocuous details such as the informant's description of the suspect or the place to be searched has been held to be insufficient.  *See Draine v. Bauman*, 708 F. Supp. 2d 693, 702 (N.D. Ill. 2010).

Moreover, the value of the informant's identification of Harold is debatable.  While the informant positively identified a picture of Harold that officers showed to him, it is undisputed that the picture was five years old and depicted him as being clean-shaven even though, at the time of the alleged sales of cocaine to the informant, Harold sported a beard.  Neither of these depictions of Harold have been presented to the court and, therefore, the court cannot discern whether a reasonable person viewing the older picture of Harold would nevertheless have been able to positively identify him.

Additionally, the McCadds argue that the defendants are not entitled to summary judgment because evidence of the informant's past reliability is disputed.  *Id.* at 700 ("The status of the individual reporting to the police [i.e., a long-standing confidential informant versus an unidentified tipster] is also significant in assessing the credibility of the information he provides.").  Although defendant officer Murphy testified that the informant had provided

information in the past that had led to arrests, he admitted that he could not remember any specific individuals arrested as a result of information obtained from the informant, had never before obtained a warrant based upon information from the informant, and that the informant was more of a "John Doe" than a "confidential informant" whose history of reliability had been tested. *See* Murphy Deposition (attached as Exhibit F to Plaintiffs' Responses to Defendants' Rule 56.1 Statements [56-1]) at 29, 30, 56.

As a result of these disputed questions of fact, the defendants are not entitled to summary judgment on the issue of whether the February 18 warrant was supported by probable cause. *See United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (the court can find that probable cause supported the issuance of a warrant only if the relevant facts are not in dispute).

### 2. Execution of the Warrant

The plaintiffs allege that officers tore up their home while executing the February 18 search warrant. Specifically, they contend that officers "ransacked the house, breaking inside doors and destroying Plaintiffs' furnace and hot water heater." Response [55-1] at 1.

The defendant argue that they are entitled to summary judgment on that portion of Count I that involves officers' execution of the February 18 warrant because the McCadds have identified no evidence of the condition of their home prior to the search. In support, they cite *Heft v. Moore*, 351 F.3d 278 (7th Cir. 2003), in which a plaintiff alleged that officers' execution of a warrant was illegal because they damaged her home while searching it. The Seventh Circuit affirmed the district court's order granting summary judgment because the plaintiff "provided no evidence regarding the pre-search condition of her home or any specific evidence that any property item was damaged. In other words, [the plaintiff] failed to provide evidence that the

police harmed her property at all, let alone provide evidence that the police harmed her property unreasonably." *Id.*

The defendants assert that the McCadds have no evidence of the condition of their home before the search and therefore, under *Heft*, the defendants are entitled to judgment on the plaintiffs' unreasonable execution claim. However, Harold McCadd stated during his deposition that before the search his home was "as tidy as it's going to be as far as I was concerned." Harold McCadd Deposition (attached as Exhibit A to the Plaintiffs' Responses to Defendants' Rule 56.1 Statements [56-1]) at 81. Additionally, Harold testified that he personally witnessed officers breaking doors within his home, *id.* at 82, as did his mother, Anna McCadd Deposition (attached as Exhibit C to the Plaintiffs' Responses to Defendants' Rule 56.1 Statements [56-1]) at 70. Accordingly, unlike the record presented in *Heft*, the McCadds have identified evidence that officers caused damage and left their home in disarray while executing the February 18 search warrant. As a result, the defendants are not entitled to summary judgment on this issue.

### III. False Arrest (Count II)

#### A. Probable Cause to Arrest

Next, the defendants seek summary judgment on Harold's claim of false arrest based upon his arrest after officers found a plastic vial of a white powder in his home. The defendants argue that they are entitled to judgment on Count II because they had probable cause to arrest Harold based upon the following: (1) an informant told them Harold sold drugs from his home, (2) a police dog alerted them to a dresser in a back bedroom of the McCadd home, and (3) defendant officer O'Toole found a small plastic vial containing a white powdery substance on the dresser.

As discussed above, disputed facts prevent the court from concluding as a matter of law that officers had probable cause to obtain a search warrant based upon information received from the John Doe informant. Likewise, whether the police dog alerted officers to the presence of drugs within the McCadd home is also a disputed fact. Accordingly, the court cannot conclude as a matter of law that either the informant or the police dog gave officers probable cause to arrest Harold.

Therefore, the defendants would be entitled to summary judgment on Count II only if they had probable cause to arrest Harold based solely on their discovery of a vial containing a white powder. The record contains no details about the vial, such as its approximate size or any other description of its appearance. Additionally, the McCadds dispute that officers found the vial in a bedroom, contending instead that officers broke into the attic and found the vial inside a suitcase. These factual disputes prohibit the court from assessing the context in which the vial was found. In addition, the lack of a sufficient description of the vial prohibits the court from gauging the reasonableness of officers' belief that the tube contained heroin as opposed to a decorative bath or beauty product. *See Bath Salt Tubes: Bath Salt Tubes Make Life Simpler*, http://www.bathbombs.org/bath-salt-tubes/ (last visited December 21, 2010) (discussing popularity of storing bath and beauty products in tubes while traveling).



Picture retrieved from

http://www.thebabblingbaby.com/products/Baby-Shower-Bath-Salt-Favor- Tubes.htm (last visited December 21, 2010). Accordingly, the defendants are not entitled to summary judgment on Harold's claim of false arrest.

### B. Qualified Immunity

Alternatively, the defendants argue that even if officers lacked probable cause to arrest, they are nevertheless entitled to summary judgment based upon the doctrine of qualified immunity. That doctrine "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). In the context of false arrest, qualified immunity shields an officer who reasonably, though mistakenly, concluded that he had probable cause to arrest. *See Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010).

Determining whether officers reasonably believed they had probable cause to arrest would require the resolution of disputed questions of fact, such as where the vial was located, what it looked like, and whether a police dog alerted to the area where it was found. Accordingly, the defendants cannot prevail at the summary judgment stage on the basis of qualified immunity. *See Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir. 1992) ("At the summary judgment stage, the defendant cannot prevail if Hall can present a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity.")

## IV.     Malicious Prosecution (Count III)

The defendants also seek summary judgment on the plaintiffs' claim of malicious prosecution. The defendants contend that they are entitled to summary judgment because probable cause to arrest is an absolute bar to a claim of malicious prosecution. *See Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) (probable cause is an absolute bar to a claim of malicious prosecution). However, as discussed above, whether the defendants had probable cause to arrest Harold turns on disputed questions of fact that must be resolved at trial. Therefore, for the same reason that the defendants are not entitled to summary judgment on the false arrest claim, their motion for summary judgment on the malicious prosecution claim is denied.

## V.     Respondeat Superior and Indemnification Claims (Counts IV and V)

Finally, the defendants seek summary judgment on the plaintiffs' claims against the City of Chicago under theories of respondeat superior and indemnification. The defendants assert that they are entitled to judgment on those claims because they are entitled to judgment on all of

the underlying claims in Counts I through III. *See Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994). However, the court has denied the defendants' motions for summary judgment on the claims in Count I involving the January 24 and February 18 search of the McCadd's home, as well as all of the claims in Counts II and III. Therefore, their argument that they are entitled to judgment on the claims in Counts IV and V for vicarious liability because they are entitled to judgment on underlying claims in Counts I through III is unavailing.

## CONCLUSION

For the reasons stated, the motion for summary judgment [57-1] is granted in part and denied in part as follows: the motion for judgment on the claim in Count I premised on the strip search of Harold is granted, while the remainder of the motion for summary judgment is denied. The parties shall report for a status hearing on January 13, 2011, at 11:00 a.m. to set a date for trial.

ENTER:

DATE: December 21, 2010

*Blanche M. Manning*
Blanche M. Manning
United States District Judge